IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

West Palm Beach Division

Case No. 18-CV-23894

XIAOYUN CHEN, PEIXUAN WANG,
HEZHANG CHEN, YANG ZHAO,
DONGLIN GU, JIALIN HAN,
WEN SHEN, YI GAO, LIJUAN FAN,
DEXIONG HU, WEN ZHANG, XIUQING
WANG, TIANJUN LI, themselves, and
derivatively, as limited partners of, and on
behalf of, Royal Palm Town Center IV, LLLP,

       *Plaintiffs,*

v.

JOSEPH J. WALSH, SR. an individual; SOUTH
ATLANTIC REGIONAL CENTER, LLC,
a Florida limited liability company; ROYAL PALM
DEVELOPMENT I, LLC, a Florida limited liability
Company; UNITED STATES REGIONAL ECONOMIC
AUTHORITY, LLC, a Florida limited liability company;
USREDA HOLDINGS, LLC, a Florida limited liability
Company, JJW CONSULTANCY, LTD., a foreign company;
and CONNECT INSURANCE GROUP, INC., a Florida
Company;

       *Defendants,*

v.

ROYAL PALM TOWN CENTER IV, LLLP,

       *Nominal Defendant*.

_____/

**PLAINTIFFS' VERIFIED EMERGENCY MOTION FOR**
**APPOINTMENT OF A RECEIVER AND PRELIMINARY INJUNCTION**

    Defrauded EB-5 investors, the undersigned Plaintiffs, themselves, and in a derivative

capacity, as limited partners of, and on behalf of, Nominal Defendant Royal Palm Town Center IV,

LLLP (the "Partnership"), move the Court for (i) the appointment of a Receiver over the Partnership

and the Job Creating Entity (defined below), and the Property (defined below), (ii) the entry of a preliminary injunction prohibiting Defendants Joseph J. Walsh ("Mr. Walsh"), South Atlantic Regional Center, LLC ("SARC"), a Florida limited liability company; Royal Palm Development I, LLC ("RPD" or "Job Creating Entity" or "JCE"), a Florida limited liability company, United States Regional Economic Development Authority, LLC ("USREDA"), a Florida limited liability company, JJW Consultancy, Ltd., a foreign company, and Connect Insurance Group, Inc., a Florida corporation, (collectively "Defendants"), from attempting to take any further actions on behalf of the Partnership or the Job Creating Entity and requiring Defendants to turn over to the Receiver all assets derived from Plaintiffs, and (iii) a stay of all third-party claims and actions against the receivership estate, the Partnership, the Job Creating Entity, any of their respective assets, and any assets purchased with funds derived from Plaintiffs, the Partnership or the Job Creating Entity, pursuant to applicable federal case law, and state:

## INTRODUCTION

Plaintiffs seek the emergency appointment of a Receiver and entry of a preliminary injunction because there is imminent danger that Plaintiffs' property will be lost or squandered through Mr. Walsh's fraudulent conduct and known secreting of Plaintiffs' assets. Without the appointment of a Receiver to preserve and proceed with the intended EB-5 project, and a preliminary injunction to stop Mr. Walsh from stealing Plaintiffs' property and sabotaging their chances at securing permanent residency in the United States, Plaintiffs will suffer irreparable harm.

Joseph J. Walsh is currently a defendant in an enforcement action (styled *Securities and Exchange Commission v. Palm House Hotel, LLLP, et al.,* Case No.18-CV-81038-DMM, pending in this District) brought by the Securities and Exchange Commission ("SEC Enforcement Action") and in other EB-5 investment-related lawsuits brought against him by defrauded investors.  It is public knowledge that foreign investors, very much like Plaintiffs, allege that they were defrauded

out of more than $50 million in an EB-5 scheme operated by Mr. Walsh commonly referred to as the Palm House Hotel.  While that is a separate EB-5 scheme with different investors, Plaintiffs here allege very similar misconduct by Mr. Walsh through the use of the entity Defendants, two of which are also subjects of the SEC Enforcement Action.

Beginning in 2010, Joseph J. Walsh founded and ran various investment programs, including the Royal Palm Professional Center project (the "Project"), as vehicles for foreign nationals to become U.S. legal permanent residents through the federal EB-5 program.  Mr. Walsh induced Plaintiffs to each invest $500,000 in the Partnership (plus administrative and legal fees for legal immigration services to be provided by Mr. Walsh's company, JJW Consultancy, Ltd.) in exchange for a limited partner position in the Partnership. Mr. Walsh represented that the Partnership would then loan the funds to a Job Creating Entity, which in conjunction with funds of other EB-5 investors,[1] would fund the purchase, construction, renovation, and leasing of sixty commercial condominium units within the Royal Palm Professional Center, and such loan would be secured with a mortgage on the units in favor of the Partnership.  Mr. Walsh assured Plaintiffs that the commercial units would be leased to a single commercial tenant, Connect Insurance Group, Inc. ("CIG")[2], which was purportedly relocating from Texas to Florida, under a ten-year lease agreement that had already been executed.  Under the lease agreement, CIG was required to complete the capital build-out of the commercial units with an allowance funded by the Partnership and in lieu of making lease

---

[1] The securities offering was made available to up to 50 individual investors.

[2] Based on State of Florida public records, Defendant CIG is a Florida corporation acquired by Deborah Johnson (Mr. Walsh's wife or ex-wife) in or around April 15, 2014. Upon information and belief, Defendant CIG is not the same Connect Insurance Group that operates a national insurance company based in Texas, as Mr. Walsh had misrepresented to Plaintiffs.

payments for the first six months of the lease term, and was thereafter responsible for annual lease payments of more than $1,000,000.

Mr. Walsh promised Plaintiffs that the foregoing business model would create the requisite number of direct and indirect jobs for Plaintiffs to meet the conditions of the EB-5 program. Mr. Walsh also promised that Plaintiffs' funds would be held in escrow until the earlier of the approval of each investor's I-526 petition (allowing them conditional permanent residency) by USCIS or receipt of 100% of the amount Walsh sought to raise in the offering.

Through his affiliated entities, Mr. Walsh received Plaintiffs' cash investments into the Partnership, and thereafter transferred the cash to the Job Creating Entity, RPD and caused RPD to purchase sixty commercial condominium units within the Royal Palm Professional Center located at 9200 Belvedere Rd, West Palm Beach, FL 33411 (the "Property").[3]  However, Mr. Walsh failed to properly document the loan from the Partnership to RPD and failed to secure the loan with a mortgage on the commercial units in favor of the Partnership as promised.  So, RPD owns the Property free from any mortgage in favor of the Partnership.

In addition, based upon the documentation Mr. Walsh provided to Plaintiffs' immigration counsel at the beginning of this year, RPD failed to make any loan payments to the Partnership, and instead made transfers of more than $9 million to CIG, between June 2012 and August 2013.  Though CIG ultimately made some payments to the Job Creating Entity through November 2016, CIG never completed the requisite capital build-out of the commercial units, terminated the lease agreement, and/or vacated the premises. Thereafter, Mr. Walsh failed to complete the requisite improvements to the units to make them marketable to other commercial tenants, failed to secure sufficient tenants to fill the vacant commercial units, and otherwise contributed to the waste of corporate assets.

---

[3] The securities offering document states that sixty-two commercial units would be purchased, but ultimately only sixty commercial units were purchased.

Further, and in addition to the foregoing unauthorized transfer of RPD funds to CIG and others, Mr. Walsh secreted at least $8.5 million of the Plaintiffs' funds by obtaining two mortgages secured by the sixty commercial units, a fact he concealed from Plaintiffs and, upon information and belief, from other Project investors.[4] Because the commercial units remain largely vacant and unimproved, Plaintiffs' I-829 petitions were denied for failure to establish the required job creation.

As a result, on September 20, 2018, Plaintiffs filed a complaint (the "Complaint") against Defendants alleging (i) claims against Mr. Walsh for fraudulent misrepresentation, fraudulent concealment, fraudulent inducement, negligent misrepresentation, conversion, theft under Florida Statutes Section 812.014, injunctive relief under Florida Statutes Section 812.035, declaratory relief under Florida Statutes Section 620.1602, and breach of fiduciary duty, (ii) derivative claims on behalf of the Partnership against Mr. Walsh for breach of fiduciary duty, corporate waste, and against Mr. Walsh and RPD for equitable accounting, and (iii) claims against all Defendants for violation of the RICO Act, 18 U.S.C. §§ 1962(c) and 1962(d), and violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

The foregoing allegations as well as those contained in the Complaint demonstrate that Mr. Walsh stole Plaintiffs' money, breached his fiduciary duties, and committed fraud and civil theft. Moreover, Mr. Walsh abandoned the Project resulting in no one working on completing the Project and/or preventing waste of the Partnership's most valuable asset.  As a result, Plaintiffs require a Receiver to take over and complete the Project and lease out the units, thereby creating the requisite jobs, so that Plaintiffs may qualify for permanent residency under the EB-5 program.

---

[4] The loan made by Centennial Bank f/k/a Stonegate Bank ("Stonegate") for $8.8 million on September 29, 2015, was secured by the Property and a collateral assignment of leases, rents and income.  On October 12, 2018, Plaintiffs learned for the first time that RPD has defaulted on its mortgage payments since March 2018, and that as a result Stonegate has attempted to collect those rents directly from the tenants of the Property pursuant to that assignment.

And, Plaintiffs require injunctive relief prohibiting Mr. Walsh from exercising control over or acting on behalf of Plaintiffs, the Partnership and the Job Creating Entity and preventing him from further absconding with Plaintiffs' funds or assets derived from those funds.

In addition, Plaintiffs would request a stay of all claims and causes of actions (known and unknown) against the newly formed receivership estate preventing any person or entity from taking any steps or action that would in any way affect any assets of the estate including, without limitation, foreclosure on the Property or rent garnishment from the Property's tenants by Stonegate or any other lender.  The Property and rental income is necessary to allow the Receiver to complete the Project and create the requisite jobs for permanent residency under the EB-5 program.  Moreover, appointment of a Receiver is also the only way to satisfy all or nearly all obligations to Stonegate and any other creditors while preserving Plaintiffs' investments and, more importantly, ensuring they are granted permanent residency through the EB-5 program.  Indeed, a foreclosure proceeding and sale of the unfinished Project will likely take years to complete and result in sale proceeds well below fair market price, less than full recovery of the loan amount owed to Stonegate, little to no recovery for unsecured creditors, and potentially a total loss of Plaintiffs' investments, not to mention the denial of their permanent residency in the United States.

In balancing the equities, the Court should consider that Plaintiffs were first promised a security interest in the Property. Had Mr. Walsh not been operating a fraud against Plaintiffs, the appropriate mortgage would have been recorded when the Partnership made the loan to RPD for the purchase and build-out of the Property (which, upon information and belief, was issued over the course of 2010 through 2012 and ultimately totaled $26 million). Thus, Stonegate would have been on notice that RPD's sole asset, the Property, was already collateralized by the Partnership's $26 million loan, and would likely not have issued another loan to RPD.

Finally, the Court should consider that RPD, according to the Offering Documents, was only permitted to obtain bank financing for the purposes of financing the Project and only if alternative financing was needed. Here, the Stonegate loan should not have been necessary had Mr. Walsh not misappropriated Plaintiffs' cash investments in the first place. And, upon information and belief, the Stonegate loan proceeds were not used in furtherance of the Project. Instead, Mr. Walsh secreted away those proceeds. Thus, Plaintiffs have been unjustly deprived of the benefit of their investment and the benefit of the Stonegate loan proceeds and are facing irreparable injury as a result. *See* Memorandum of Law Section I.E., *infra*.

In sum, the Stonegate loan and mortgage was merely another element of Mr. Walsh's fraudulent scheme. The proceeds of that loan likely are being used by Mr. Walsh to pay the costs of defending himself in the SEC Enforcement Action and the action brought by the defrauded investors of the Palm House Hotel project and will be used to defend himself in this action. It would be unjust and improper for Stonegate (or any other creditor) to be permitted to foreclose on the Property in light of the foregoing circumstances.

## FACTUAL BACKGROUND

### EB-5 Program

USCIS administers the federal EB-5 Program, which provides an opportunity for a foreign national to obtain legal permanent residency in the United States by investing $500,000 or $1,000,000 in a new commercial enterprise that creates at least ten qualified full-time jobs for U.S. workers based on that investment. After approval of the I-526 petition, the immigrant investor receives conditional permanent residence status for a period of 2 years. Before the filing of Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status (an I-829 petition), the regional center through which the particular EB-5 program is run is required to invest

the immigrant's capital contribution in a job-creating commercial enterprise that creates at least ten qualified full-time positions for U.S. workers.

After an immigrant investor demonstrates to USCIS that his or her capital contribution was invested into a job-creating entity that produced at least ten qualified full-time jobs for U.S. workers based on the investment, the investor (and his or her immediate family) is granted U.S. lawful permanent residency, through the filing and approval of an I-829 petition.

**South Atlantic Regional Center**

Regional centers are organizations designated by USCIS to promote economic growth in a particular geographic region of the United States.  When a foreign national invests in an EB-5 project under a regional center, the job-creation requirement can be satisfied through a showing of indirect jobs created, rather than only direct jobs created.  On May 27, 2010, Mr. Walsh applied for and received USCIS approval for the creation of the South Atlantic Regional Center located in Palm Beach, Florida. Since 2010, Mr. Walsh has promoted several EB-5 projects, including the Royal Palm Professional Center, and several other developments.[5]

**Walsh's Affiliated Entities**

Mr. Walsh is the direct or indirect sole member of Defendants SARC, RPD, USREDA, USREDA Holdings LLC, and JJW Consultancy, Ltd. (together, "Affiliated Entities").  Mr. Walsh is an "alter ego" of the Affiliated Entities, and used the Affiliated Entities for his own personal benefit so as to blur the distinction between his business and personal affairs. Mr. Walsh used the various Affiliated Entities to mislead or defraud Plaintiffs and for the purpose of perpetrating a fraud upon Plaintiffs. The Affiliated Entities are mere instrumentalities of Mr. Walsh's fraud.

---

[5] One of the SARC projects is the Palm House Hotel project, which, as explained above, is the subject of a civil fraud action brought by the defrauded investors and the SEC Enforcement Action.

**<u>Royal Palm Professional Center Project</u>**

Beginning in 2010, Mr. Walsh began promoting the Royal Palm Professional Center Project, through which foreign investors could participate in a job-creation venture through real estate acquisition.  By way of a securities sales contract, investors would invest $500,000 into the Partnership in exchange for one partnership share and pay an additional $50,000-$60,000 in administrative and legal fees.

The securities offering was made to a total of 52 potential investors for a total capital raise of $26,000,000.  The funds invested into the Partnership would be loaned to the Job Creating Entity for the purchase of the Property, and such loan would be secured by a promissory note and mortgage on the Property in favor of the Partnership.

The Property would then be renovated, improved, and leased to a commercial single commercial tenant.  Job creation would be measured by the economic impact of the leased space.

**<u>Defendant Walsh's Knowing and Intentional Misrepresentations to Plaintiffs</u>**

In the Confidential Private Placement Offering Memorandum ("PPM"), together with its exhibits, (the "Offering Documents"), identified as **Composite Exhibit A** (but not attached hereto),[6] Mr. Walsh made the following material representations to Plaintiffs concerning the legitimacy of the Project, calculated to induce Plaintiffs to select the Project for their investment:

1.    That the General Partner of the Partnership would be a USCIS-approved regional center, SARC, not Mr. Walsh, personally;

2.    That the Pugliese Company was the developer of the Royal Palm Professional Center buildings, to lend an air of legitimacy to the Project, leading

---

[6] The Offering Documents are not attached hereto because they are designated as confidential. However, the Plaintiffs will make the Offering Documents available to the Court for *in camera* inspections as the Court may so require.

investors to believe that the Pugliese Company was somehow affiliated with the Project;

       3.     That Plaintiffs would be investing in the fourth phase of an ongoing development project led by multi-millionaire Mr. Pugliese;

       4.     That the third phase of the Royal Palm development project was the development and sale of the current district offices of the United States Citizenship and Immigration Services; and

       5.     That the Pugliese Company had already invested $8,000,000 of its own money into the Project.

Mr. Walsh knowingly made those false representations.  The truth is:

       1.     At all times, the General Partner of the Partnership was actually Mr. Walsh;

       2.     The Pugliese Company was not affiliated with the Project in any way;

       3.     The Project was not a fourth phase of a development project led by Mr. Pugliese;

       4.     The Project, other than being in close proximity to the offices of USCIS, had no affiliation with or endorsement from USCIS; and

       5.     The Pugliese Company had not invested any of its own money, much less $8,000,000, into the Project.

In addition, Mr. Walsh also made the following material misrepresentations to Plaintiffs, in the Offering Documents (Exhibit A), as to the viability of the Project and the protection of their investment calculated to induce Plaintiffs to select the Project for their investment:

       1.     That the investment would be secured by a "first rank mortgage on the high value building" worth $36.2 million and a "first rank mortgage on the leasing

income of the property" worth $9.6 million, and that the building would be purchased by the tenant CIG after 5 years;

2.      That the building is 100% free of debt;

3.      That the building had already been completed;

4.      That the Property had already been leased for 10 years;

5.      That the Project is a completed project, with all exterior finishes, roads, landscaping, electrical and plumbing finished, and that the interior build-out would be done by a new tenant;

6.      That the creation of the required number of EB-5 jobs is guaranteed by virtue of the lease commitment with CIG;

7.      That the Project is in a premier location adjacent to the USCIS offices in Palm Beach;

8.      That the office space had already been fully-leased pursuant to a ten-year lease with CIG;

9.      That the building was already completed with $8,000,000 already invested by the Pugliese Company; and

10.      That the 52 units could be purchased for $26,000,000 and that after renovations (which would be completed by the tenant), the building would be worth $36,235,000.

Mr. Walsh knowingly made the foregoing false representations.  The truth is:

1.      The Plaintiffs' investments were not secured by a mortgage or any loan documents;

2.      CIG did not purchase the property for $4 million above the $26 million investment amount.  In fact, CIG failed to make capital improvements to the

commercial units it was leasing, actually terminated the lease agreement prematurely, and was the recipient of more than $9 million in transfers from RPD, which funds were not used for the intended purpose;

3.      Several mortgages were obtained which encumbered the Property in the amount of $12.5 million;

4.      The commercial units were not completed, but rather required capital build-outs before they would be ready for occupancy by any tenant;

5.      The Property had not been leased to CIG for a ten-year period.  In fact, the purported ten-year lease agreement with CIG was dated January 2010, when RPD did not actually acquire all sixty commercial units until May 2012 for only a five-year renewable term;

6.      CIG did not purchase the Property at the end of the lease term but, in fact, terminated the lease agreement prematurely, without completing the requisite capital build-out and having received transfers of more than $9 million in cash from RPD, which funds were not used for the intended purpose; and

7.      The requisite number of EB-5 jobs were not created because the commercial units were not occupied by a bona fide tenant and, as a result, Plaintiffs' I-829 petitions were denied;

8.      The building is not fully renovated and is worth far less than $36,235,000.

In addition, the marketing materials bear the name USREDA, one of Mr. Walsh's companies, which stands for United States Regional Economic Development Authority.  This name was reasonably calculated to convey the false impression that the business had some connection with, or endorsement, authorization, or approval from, the Government of the United States, or any agency

thereof, and for the purpose of inducing Plaintiffs to each transfer more than $500,000.00 to Royal Palm Town Center IV, LLLP.  *See* 18 U.S.C. § 709 *and United States v. U.S.I.A. Homes, Inc.*, 409 F. Supp. 483, 486 (E.D.N.Y. 1976); 18 U.S.C. § 506; *United States v. Baby-Tenda Corp.*, 2007 WL 2434057, at *2 (W.D. Mo. Aug. 22, 2007); and 18 U.S.C. § 1341.

**Defendants' Improper Use and Transfer of Plaintiffs' Funds**

Based upon the foregoing misrepresentations contained in the Offering Documents (Exhibit A) and without knowledge as to their falsity, Plaintiffs each entered into a securities sales contract with the Partnership, and received a limited partner share in exchange for a payment of $500,000. Plaintiffs also made transfers to one or more of Mr. Walsh's Affiliated Entities, for payment of legal and administrative fees, in connection with the Project between 2011 and 2016.

Plaintiffs submitted their I-526 petitions for conditional permanent residency, which required a showing of the viability of the Project.  Plaintiffs' I-526 petitions were approved.   Following approval of their I-526 petitions, Plaintiffs resided in the United States.  By the time Plaintiffs submitted their I-829 petitions, however, Mr. Walsh had only provided purported proof that 50 jobs had been created.  As a result, Plaintiffs' I-829 petitions were denied for insufficient job creation.

It was not until after Plaintiffs' I-829 petitions were denied, the first denial being in January 2018, that Plaintiffs discovered the fraud perpetrated by Mr. Walsh and the Affiliated Entities. Following the denial of their I-829 petitions in 2018, upon further investigation, and the hiring of separate immigration counsel, Plaintiffs learned that Mr. Walsh and the Affiliated Entities had concealed from Plaintiffs that:

> 1.  CIG, the single commercial tenant from which the jobs were supposed to be created, did not renovate or make improvements to the commercial units as agreed, cancelled the lease agreement in 2016, and was the recipient of more

13

than $9 million in transfers from RPD, which funds were not used for the intended purpose of building out the interior of the commercial units;

2.    CIG is not affiliated with a large independent insurance agency, as Plaintiffs were led to believe, but rather was transferred in 2014 (after receiving millions of dollars in cash from RPD) to an individual believed to be Mr. Walsh's relative;

3.    RPD failed to make any loan payments to the Partnership, failed to record the loan with a mortgage on the commercial units in favor of the Partnership, and, upon information and belief, otherwise failed to protect Plaintiffs' investments;

4.    RPD failed to make any payments to the Partnership, but rather made transfers to others, including more than $9 million to CIG, which funds were not used for the intended purpose; and

5.    Upon information and belief, Mr. Walsh had encumbered the commercial units by obtaining a mortgage in the amount of $3.3 million on September 3, 2013, a mortgage in the amount $4 million on January 30, 2014, and a mortgage in the amount of $8.8 million on September 29, 2015.[7] Upon information and belief, the funds obtained for those mortgages were not used to improve the Property or toward completion of the Project in any way.

Accordingly, upon information and belief, Mr. Walsh directly and/or through the Affiliated Entities, has intentionally stolen Plaintiffs' investments and the mortgage proceeds obtained by encumbering the Property. The facts detailed herein and in the Complaint establish that Plaintiffs are entitled to the appointment of a Receiver in accordance with applicable Federal law and principals

---

[7] On January 29, 2014, the $3.3 million mortgage was satisfied.

of equity.  Indeed, a Receiver is necessary here to: (i) take control of the Partnership; (ii) preserve any value left in the Property; (iii) complete the build out of the Project to increase its value and facilitate leasing the units to create the jobs necessary for Plaintiffs to obtain their permanent residency; (iv) locate and recover Plaintiffs' investments, if there are funds remaining, and/or marshal assets purchased with Plaintiffs' funds; and (v) recover Defendants' fraudulent transfers to insiders or third parties.

**MEMORANDUM OF LAW**

I.   **PLAINTIFFS ARE ENTITLED TO THE APPOINTMENT OF A RECEIVER OVER CERTAIN DEFENDANTS AND INJUNCTIVE RELIEF.**

   A.  **Receivership and Injunctive Relief**

Federal courts consider a variety of factors in determining whether a receiver is warranted, including: (1) the presence of a contractual receivership provision; (2) fraudulent conduct on the part of the defendant; (3) imminent danger that property will be lost or squandered; (4) the inadequacy of available legal remedies; (5) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; (6) plaintiff's likelihood of success on the merits; and (7) whether the receivership will in fact serve the plaintiff's interests.  *See Bank of Am., N.A. v. Fla. Glass of Tampa Bay, Inc.,* 2016 WL 6778877, at *3 (M.D. Fla. Nov. 16, 2016) (citing *Consol. Rail Corp. v. Fore River Ry. Co.,* 861 F.2d 322, 326–27 (1st Cir. 1988) (cited with approval in *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998))).

Federal courts consider several of those same factors in granting injunctive relief as requested herein by Plaintiffs.  Indeed, a district court may grant a preliminary injunction if the moving party shows that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever

15

damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *See TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015) (citations omitted).

**B. A Receiver is Appropriate Because the Facts Show That Mr. Walsh Committed Fraud Against Plaintiffs In Breach of His Fiduciary Duties.**

A court of equity has the authority to appoint a receiver where the facts, as here, adequately establish that Defendant Walsh committed fraud against and breached his fiduciary duty owed to Plaintiffs and the Partnership. As the general partner in a limited liability partnership, Mr. Walsh owed a fiduciary duty to each of the limited partner Plaintiffs and to the Partnership. Instead of abiding by his duties, Mr. Walsh made intentional misrepresentations of material facts and defrauded Plaintiffs into investing in the Partnership knowing that he would not use their funds to build out the Project and meet the requirements for them to obtain their permanent residency. Indeed, Mr. Walsh engaged in fraudulent conduct and breached his duties by (a) using Plaintiffs' investments to purchase Property and not securing those investments with a mortgage as promised; (b) mismanaging and wasting the Partnership's assets in not completing the build-out of the Property and not leasing it out to create the requisite jobs; (c) misappropriating at least $9 million of the Partnership's assets for his personal gain; (e) unjustly enriching himself at Plaintiffs' and the Partnership's expense, (f) converting assets, cash, or cash equivalents belonging to each Plaintiff and/or to the Partnership; (g) failing to adhere to the reasonably prudent businessman standard; and (h) most significantly, fraudulently inducing Plaintiffs to invest in the Partnership for the sake of obtaining permanent residency and then not taking the necessary steps to procure residency for Plaintiffs. Moreover, in carrying out these breaches, Mr. Walsh made intentional misrepresentations of material facts and defrauded Plaintiffs into investing in the Partnership knowing that he would not use their funds to build out the Project and obtain their permanent residency.

As such, this Court should exercise its equity jurisdiction and appoint a Receiver and grant injunctive relief to prevent any further breaches of duties and fraudulent conduct by Mr. Walsh and to allow the Receiver to complete the Project as required for Plaintiffs to obtain permanent residency.

### C. A Receiver is Appropriate Because the Facts Show That Mr. Walsh is Wasting the Partnership's and Plaintiffs' Assets.

Where there is a clear and present danger of waste to the Plaintiffs', the Partnership's and/or the Job Creating Entity's assets, a receiver must be appointed to preserve those assets pending the outcome of this litigation.  Here, the facts demonstrate that Mr. Walsh has, and likely continues to, secret Plaintiffs' assets through the substantial, surreptitious, and unauthorized encumbrance of the Property – the most recent example of which Plaintiffs learned was an $8.5 million loan Mr. Walsh collateralized with the Property and the $9 million he transferred to CIG (the entity that was later transferred to an individual believed to be Mr. Walsh's relative).  And, a Receiver is necessary to ensure that Mr. Walsh is prevented from absconding with the Plaintiffs' and the Partnership's assets through substantial, unauthorized draws from the corporate bank accounts.  At this time, Plaintiffs suspect Mr. Walsh is utilizing Plaintiffs' own funds or assets to defend himself against the claims of the defrauded investors in the other civil fraud action, the claims of the SEC in the recently-filed enforcement action, and the claims of Plaintiffs in this action.

If a Receiver is not appointed to take possession of the Partnership, the Job Creating Entity, the Property and all assets derived from Plaintiffs, Plaintiffs face imminent danger that Mr. Walsh will continue to damage those entities and waste those assets.  A receivership estate and injunctive relief is also necessary to protect those assets from third-party claims and foreclosure on the Property.

**D. Plaintiffs have Demonstrated Substantial Likelihood of Success on the Merits.**

Plaintiffs have a clear legal right to the Property and to recovery of their investment here and, as such, have demonstrated a substantial likelihood of success on the merits on their claims. Plaintiffs are the rightful owners of the Property and all other assets acquired with their investment funds. Indeed, Defendants misused those funds and purposefully failed to secure Plaintiffs' investments. Mr. Walsh also failed to complete the build-out of the Property and create jobs required for Plaintiffs to obtain permanent residency. Mr. Walsh continues to assert control and authority over the Property, over Plaintiffs' assets and over Plaintiffs' funds without authority to do so and in violation of the Offering Documents (Exhibit A). Plaintiffs' allegations herein and in the Complaint demonstrate that Mr. Walsh fraudulently induced them to enter into this investment. The allegations also demonstrate that as part of the fraud, Mr. Walsh used the Property to secure debts, when the Property was already promised as collateral for the loan provided by the Partnership. Then, Mr. Walsh absconded with all loan proceeds – both those derived from Plaintiffs as well as from third parties.

As such, Plaintiffs have a clear legal right to recover their investments and a substantial likelihood of success on the merits of their claims warranting appointment of a Receiver and injunctive relief against Mr. Walsh and third parties that would seek to take the Property and income derived therefrom despite the fact that Plaintiffs' secured interest in the Property arises first in time.

**E. Plaintiffs will Suffer Irreparable Harm and have no Adequate Remedy at Law.**

Plaintiffs will suffer irreparable harm and have no adequate remedy at law if Mr. Walsh continues to act on behalf of the Partnership or the Job Creating Entity, and continues to exercise dominion and control over those companies and their assets, all of which are derived from Plaintiffs' investments. Indeed, in addition to the continued waste of Plaintiffs' assets described above, denial of a Receiver and injunctive relief means that the Project will not be completed and the requisite job

creation will not occur.  Plaintiffs are all waiting for USCIS to decide on their recently filed motions to reopen/reconsider the denial of their I-829 petitions. Due to the inactivity of the Project, it is expected that their motions will be denied. Once denied, Petitioners may have to immediately appear before an immigration law judge who will decide whether to allow the investors to remain in the U.S. or issue a deportation order.

The majority of Plaintiffs and their respective families have lived in the United States in lawful conditional permanent resident status since as early as 2013. Denial of permanent residency would result in Plaintiffs being deported from their homes in the United States to a foreign country to which many of them no longer have any ties. The failure to meet the requirements for an EB-5 visa and resulting denial of permanent residency and deportation of Plaintiffs would undeniably and irreparably harm Plaintiffs and their families, all of whom reside in the United States.    In light of the foregoing facts establishing irreparable harm to Plaintiffs, an order appointing a Receiver is warranted.

### F.  The Threatened Injury to Plaintiffs Outweighs any Interest Defendants Have in Preventing Appointment of a Receiver or Injunctive Relief and is not Adverse to the Public Interest.

Based on the foregoing arguments and the allegations in the Complaint, Plaintiffs have demonstrated the dire necessity of a Receiver to complete the build-out of the Project and lease out the commercial units – providing Plaintiffs' only opportunity to obtain permanent residency.  So, the Court should consider that the probability of harm to Plaintiffs by denial of the appointment (most likely resulting in the inability to obtain residency and requiring deportation) would be much greater than any injury to Mr. Walsh or the other Defendants.

Moreover, the Court should enjoin Mr. Walsh from acting on behalf of the Partnership and the Job Creating Entity so that the Receiver could carry out his or her duties in completing the Project and recovering Plaintiffs' investments.  The injury to the receivership estate would be significant if

the Receiver is unable to fulfill his or her duties due to Mr. Walsh's interference as general partner

of the Partnership and owner of the Job Creating Entity.  Thus far, Mr. Walsh has only wasted those

entities' assets and funds and likely continues to do so in defending himself from the various fraud

lawsuits brought against him.  Therefore, the Court should not even consider the injury to Mr. Walsh

in removing him from control over those entities.

Further, the Court should consider that Mr. Walsh, SARC and USREDA are subjects of the

SEC Enforcement Action for claims of fraud in another EB-5 investment program operated by Mr.

Walsh.  Thus, the public interest is best served by removing Mr. Walsh from control, as requested

herein, and stopping him from defrauding anyone else.

Thus, the Court should appoint a Receiver to take over and complete the Project and to

recover Plaintiffs' investments and enter an injunction prohibiting Mr. Walsh and the other

Defendants from attempting to take any further actions on behalf of the Plaintiffs, the Partnership,

and the Job Creating Entity, including but not limited to accessing company bank accounts and

absconding with their funds and/or selling or encumbering any company property.  And, in order to

allow the Receiver to complete the Project, as required for approval of Plaintiffs' permanent

residency, the Court should stay all third-party claims against the Partnership, the Job Creating Entity

and the Property and to any income derived therefrom.

## II.     PLAINTIFFS HAVE STANDING TO SEEK APPOINTMENT OF A RECEIVER.

A party generally has standing to seek appointment of a Receiver "by virtue of a legal or

equitable claim, such as a claim of ownership of the property in controversy, or a lien or property

right therein...." *See Motion Dynamics, Inc. v. Nu-Best Franchising, Inc.*, 2006 WL 1050639, at *7

(M.D. Fla. Apr. 20, 2006) (applying Florida law on standing).  Here, Plaintiffs invested all of the

funds used to purchase the Property (held by the Job Creating Entity) with the intention and

understanding that Plaintiffs would receive limited partnership shares in the Partnership, which would hold a mortgage against the Property, to protect Plaintiffs' investments and their interest in obtaining permanent residency through the EB-5 program. Accordingly, Plaintiffs are the equitable and beneficial owners of the Property with standing to seek the appointment of a Receiver over both the Job Creating Entity and the Partnership.

## III.   PLAINTIFFS ARE ENTITLED TO AN INJUNCTION AGAINST DEFENDANTS PURSUANT TO SECTION 812.035, FLORIDA STATUTES.

Plaintiffs have alleged that Mr. Walsh individually and through Defendants stole Plaintiffs' investments in the Partnership, thereby committing theft under Section 812.014, Florida Statutes. Florida law provides Plaintiffs with a civil remedy for Mr. Walsh's criminal theft, including but not limited to the imposition of an injunction, pursuant to Section 812.035, Florida Statutes. *See* Sections 772.105 and 812.035, Florida Statutes; *see also Escudero v. Hasburn*, 829 So. 2d 1144 (Fla. 3d DCA 1997) (affirming entry of emergency temporary injunction under the Florida civil theft statute) *and Bank of America, N.A. v. Colonial Bank*, 2009 WL 10668410 (S.D. Fla. Aug. 13, 2009).  In the Complaint, Plaintiffs seek an injunction against Mr. Walsh pursuant to Florida Statutes.

Mr. Walsh individually and through Defendants knowingly obtained and used Plaintiffs' property with the intent to deprive Plaintiffs of their rights to the property and/or the benefit from the property in violation of Section 812.014, Florida Statutes. Further, Defendants have appropriated Plaintiffs' property for their own use, in violation of Section 812.014, Florida Statutes.  Specifically, Plaintiffs each provided over $500,000 to invest in the Partnership for the purpose of developing the Project, creating jobs and obtaining permanent residency through the federal EB-5 program. Mr. Walsh, thereafter, took Plaintiffs' investments out of the Partnership's escrow account, used them for purposes other than development of the Project and, upon information and belief, secreted away

funds through improper transfers to the entity Defendants. As a result of Mr. Walsh's unlawful conduct, Plaintiffs have been deprived of the right to and benefit from their property.

Where an injunction is sought in civil theft cases, "Florida law relaxes the traditional "irreparable harm" requirement…and instead only requires the movant to make "a showing of immediate danger of significant loss." *See Bank of America v. Colonial Bank* at *1. Here, Plaintiffs' investments are at significant risk of dissipation and misappropriation because Mr. Walsh is likely using those funds to defend himself in various EB-5 fraud lawsuits and the SEC Enforcement Action brought against him.

And, on October 12, 2018, Plaintiffs learned for the first time that RPD has defaulted on its mortgage payments to Stonegate (in connection with an $8.8 million loan) since March 2018, and that as recently as September 25, 2018, Stonegate has attempted to collect those rents directly from the tenants of the Property pursuant to that assignment, and has threatened to take possession of the Property. *See* Stonegate letter dated September 29, 2018 attached as **Exhibit B**. As such, Plaintiffs' property is in immediate danger of significant loss not only to Mr. Walsh and his fraudulent scheme, but also to Stonegate.

As such, the Court should enter an injunction, pursuant to Section 812.035, Florida Statutes, enjoining Mr. Walsh from taking action on behalf of the Partnership, and from directly or indirectly disposing of, secreting, or otherwise encumbering the property of and derived from Plaintiffs, ordering Defendants to divest themselves of any interest in the Partnership and to turn over any of Plaintiffs' funds or property purchased therewith to the Receiver.  The Court should also impose reasonable restrictions upon Defendants' future activities, including, but not limited to, prohibiting Mr. Walsh from engaging in the same type of endeavor as the enterprise in which he was engaged in violation of the provisions of Section 812.014, Florida Statutes.

## IV.    CONCLUSION

Based upon the foregoing, Plaintiffs are entitled to the appointment of a Receiver over the assets and properties of the Partnership and the Job Creating Entity and over Plaintiffs' funds and assets, wherever located, and also to injunctive relief to assist the Receiver in carrying out his duties of marshaling and preserving Plaintiffs' assets and prohibiting Mr. Walsh from continuing to act on behalf of the Partnership or the Job Creating Entity.

## V.    PROPOSED RECEIVER

Should the Court grant the relief requested in this Motion, Plaintiffs respectfully recommends that the Court appoint Daniel Newman, Esq., a partner with the law firm of Nelson Mullins Broad and Cassel, to serve as Receiver over the Partnership and the Job Creating Entity and their respective assets.   Mr. Newman has extensive experience and has had much success serving as receiver and receiver's counsel in government enforcement actions in federal court, serving as receiver in state court litigation matters, and prosecuting and defending against claims in securities fraud matters, fraudulent transfer and other asset recovery actions, complex commercial litigation, and real property disputes. A copy of Mr. Newman's résumé is attached hereto as **Exhibit C**. Mr. Newman has agreed to cap his hourly rate for this matter at $400 and has run a conflict check and confirmed that he does not have any conflict in serving as Receiver in this matter.

Alternatively, Plaintiffs respectfully propose that the Court consider the following Receiver candidates:  (i) James Sallah, Esq.; (ii) Jacqueline Calderin, Esq.; and (iii) Scott Brown, Esq.  Mr. Sallah's résumé is attached hereto as **Exhibit D**. Mr. Sallah has agreed to cap his hourly rate at $300. Ms. Calderin's résumé is attached hereto as **Exhibit E**. Ms. Calderin has agreed to cap her hourly rate at $350. Mr. Brown's résumé is attached hereto as **Exhibit F**. Mr. Brown has agreed to cap his

hourly rate at $400. All of these candidates and their respective law firms have significant experience serving as and/or representing Receivers and other fiduciaries in enforcement actions, civil litigation and/or bankruptcy proceedings, and representing various interests in fraud and asset recovery actions, complex commercial litigation, and real property disputes.  In addition, these candidates have run a conflicts check and have reported no conflicts.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

1.     Appointing a Receiver over the Property, Defendant Royal Palm Development I, LLC (as owner of the Property and as the Job Creating Entity), and Nominal Defendant Royal Palm Town Center IV, LLLP (as the Partnership), and all of their respective assets, with duties to (i) take all actions necessary to complete the Project and lease out the units, (ii) collect rents pursuant to preexisting lease agreements, (iii) make payments for maintenance and other obligations, (iv) take possession and safeguard all personalty held by and/or contained within the real property held by the foregoing companies, (v) take possession of and safeguard the proceeds of the loans obtained on the Property and any other assets or funds derived from Plaintiffs' investments, and (vi) to the extent there are rent proceeds available after payment of the receivership estate's administrative expenses, to service the debt secured by the Property;

2.     Directing tenants to pay rents due on the units in the Property directly to the Receiver so that he or she may (i) build out and/or renovate the unit to facilitate leasing them to tenants, (ii) pay all reasonable expenses of the Property necessary to maintain the Property and the leases, (iii) pay the administrative expenses of the estate including the fees and costs incurred by the Receiver in connection with fulfilling his or her duties under the appointment order, and (iv) service any legitimate debt for which the Property was duly pledged as collateral;

3.     Enjoining Mr. Walsh from taking any action on behalf of Plaintiffs, the Job Creating Entity, the Partnership, the Property, and any other assets of those entities, including but not limited

24

to (i) filing documents with the Florida Department of State, (ii) filing tax returns for the Job Creating Entity or the Partnership, (iii) accessing any bank accounts containing funds derived from Plaintiffs' investments, (iv) selling or encumbering the Property or any other assets derived from Plaintiffs' investments, (v) collecting rents on any of the units in the Property, and (vi) directly or indirectly disposing of, secreting, or otherwise encumbering the Property, any assets of the Job Creating Entity or the Partnership, and any funds of Plaintiffs remaining in the Project (or under the control of any of the Defendants) and any and all assets purchased using Plaintiffs' funds;

4.     Requiring Mr. Walsh to provide a sworn accounting disclosing all bank accounts held in his name or in the name of any other Defendant and all expenditures of Plaintiffs' funds, and ordering immediate turnover to the Receiver of all funds of Plaintiffs remaining in the Project (or under the control of any of the Defendants) and any and all assets derived purchased with or from Plaintiffs' funds wherever located;

5.     Ordering Defendants to divest themselves of any interest in the Partnership and the Job Creating Entity and to turn over to the Receiver any funds of Plaintiffs' remaining in the Project (or under the control of any of the Defendants) and any assets purchased using Plaintiffs' funds;

6.     Imposing reasonable restrictions upon Defendants' future activities including, but not limited to, prohibiting Mr. Walsh from engaging in the same type of EB-5 investment enterprise, which is the subject of the Complaint and this Motion, in violation of the provisions of Section 812.014, Florida Statutes;

7.     Enjoining Defendants and all third parties from making demand against, commencing, and/or continuing to prosecute any action seeking to take possession, custody or control of any asset of the Partnership and/or of the Job Creating Entity or depriving those entities of use, possession, custody or control of any asset, including without limitation enjoining and

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

      8.    Granting such further relief as this Court deems just and proper.

## **VERIFICATION**

      Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October _____, 2018.

_____
Xiaoyun Chen


_____
Peixuan Wang


_____
Hezhang Chen


_____
Yang Zhao


_____
Dongling Gu


_____
Jialin Han


_____
Wen Shen (Hua Xu)


_____
Yi Gao

26

_____
Dexiong Hu


_____
Wen Zhang


_____
Xiuqing Wang


_____
Tianjun Li



DATED this 26th day of October, 2018.

Respectfully Submitted,

DAMIAN & VALORI LLP
*Attorneys for Plaintiffs*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

By: */s/ Kenneth Dante Murena*
     Kenneth Dante Murena, Esq.
      Florida Bar No. 147486
      Kmurena@dvllp.com
     Allison J. Leonard, Esq.
      Florida Bar No. 87061
      Aleonard@dvllp.com

staying any foreclosure actions against the Property and/or demands for payment of rents due on the units in the Property; and

      8.      Granting such further relief as this Court deems just and proper.

## **VERIFICATION**

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October 21, 2018.

_____
Xiaoyun Chen

_____
Peixuan Wang

_____
Hezhang Chen

_____
Yang Zhao

_____
Dongling Gu

_____
Jialin Han

_____
Wen Shen (Hua Xu)

_____
Yi Gao

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

8.     Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October 21, 2018.

_____
Xiaoyun Chen

_____
Peixuan Wang

_____
Hezhang Chen

_____
Yang Zhao

_____
Dongling Gu

_____
Jialin Han

_____
Wen Shen (Hua Xu)

_____
Yi Gao

26

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

8.    Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October __22__, 2018.

_____
Xiaoyun Chen


_____
Peixuan Wang

_____
Hezhang Chen


_____
Yang Zhao


_____
Dongling Gu


_____
Jialin Han


_____
Wen Shen (Hua Xu)


_____
Yi Gao

staying any foreclosure actions against the Property and/or demands for payment of rents due on the units in the Property; and

8.     Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October 20 , 2018.

_____

Xiaoyun Chen

_____

Peixuan Wang

_____

Hezhang Chen

_____

Yang Zhao

_____

Dongling Gu

_____

Jialin Han

_____

Wen Shen (Hua Xu)

_____

Yi Gao

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

> 8.      Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October _____, 2018.

_____
Xiaoyun Chen


_____
Peixuan Wang


_____
Hezhang Chen


_____
Yang Zhao

*Dongling Gu*
_____
Dongling Gu


_____
Jialin Han


_____
Wen Shen (Hua Xu)


_____
Yi Gao

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

8.    Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October **20**, 2018.

_____
Xiaoyun Chen

_____
Peixuan Wang

_____
Hezhang Chen

_____
Yang Zhao

_____
Dongling Gu

*Jia Lin Han*
_____
Jialin Han

_____
Wen Shen (Hua Xu)

_____
Yi Gao

26

staying any foreclosure actions against the Property and/or demands for payment of rents due on

the units in the Property; and

      8.     Granting such further relief as this Court deems just and proper.

## **VERIFICATION**

    Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October 19 , 2018.

 

_____

Xiaoyun Chen


_____

Peixuan Wang


_____

Hezhang Chen


_____

Yang Zhao


_____

Dongling Gu


_____

Jialin Han


_____

Wen Shen (Hua Xu)


_____

Yi Gao

26

staying any foreclosure actions against the Property and/or demands for payment of rents due on the units in the Property; and

8.      Granting such further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Dated: October 20, 2018.

_____
Xiaoyun Chen

_____
Peixuan Wang

_____
Hezhang Chen

_____
Yang Zhao

_____
Dongling Gu

_____
Jialin Han

_____
Wen Shen (Hua Xu)

_____
Yi Gao

_Dexiong Hu_
_____
Dexiong Hu

_____
Wen Zhang

_____
Xiuqing Wang

_____
Tianjun Li

DATED this 20th day of October, 2018.

Respectfully Submitted,

DAMIAN & VALORI LLP
*Attorneys for Plaintiffs*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

By: /s/ Kenneth Dante Murena
       Kenneth Dante Murena, Esq.
       Florida Bar No. 147486
       Kmurena@dvllp.com
    Allison J. Leonard, Esq.
       Florida Bar No. 87061
       Aleonard@dvllp.com

27

_____

Dexiong Hu

_____

Wen Zhang

_____

Xiuqing Wang

_____

Tianjun Li


DATED this 22 day of October, 2018.

                    Respectfully Submitted,

                    DAMIAN & VALORI LLP
                    *Attorneys for Plaintiffs*
                    1000 Brickell Avenue, Suite 1020
                    Miami, Florida 33131
                    Telephone: (305) 371-3960
                    Facsimile: (305) 371-3965

                    By: */s/ Kenneth Dante Murena*
                         Kenneth Dante Murena, Esq.
                         Florida Bar No. 147486
                         Kmurena@dvllp.com
                         Allison J. Leonard, Esq.
                         Florida Bar No. 87061
                         Aleonard@dvllp.com

27

_____
Dexiong Hu


_____
Wen Zhang

Xiuqing Wang
_____
Xiuqing Wang


_____
Tianjun Li


DATED this _____ day of October, 2018.


Respectfully Submitted,

DAMIAN & VALORI LLP
*Attorneys for Plaintiffs*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

By: */s/ Kenneth Dante Murena*
     Kenneth Dante Murena, Esq.
      Florida Bar No. 147486
      Kmurena@dvllp.com
     Allison J. Leonard, Esq.
      Florida Bar No. 87061
      Aleonard@dvllp.com

27

_____
Dexiong Hu


_____
Wen Zhang


_____
Xiuqing Wang


_____
Tianjun Li


DATED this _____ day of October, 2018.


Respectfully Submitted,

DAMIAN & VALORI LLP
*Attorneys for Plaintiffs*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

By: /s/ *Kenneth Dante Murena*
        Kenneth Dante Murena, Esq.
        Florida Bar No. 147486
        Kmurena@dvllp.com
        Allison J. Leonard, Esq.
        Florida Bar No. 87061
        Aleonard@dvllp.com


27